# **Exhibit E**

Amended Reply Expert Report of Brian M. Sowers to the Report of James T. Berger

"Berger Reply"

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| LIFEGUARD LICENSING CORP., and POPULARITY PRODUCTS, LLC, | ) ) ) | |
| | ) | Civil Action No. 15-CV-08459-LGS |
| Plaintiffs | ) ) | |
| - against - | ) ) | **AMENDED REPLY EXPERT REPORT OF BRIAN M. SOWERS TO THE REPORT OF JAMES T. BERGER** |
| JERRY KOZAK, ANN ARBOR T-SHIRT COMPANY, LLC, and RICHARD WINOWIECKI | ) ) ) | |
| Defendants. | ) ) | |

**Brian M. Sowers**

Applied Marketing Science, Inc.

303 Wyman St.

Waltham, Massachusetts 02451

(781) 250-6313 Fax (781) 684-0075

bsowers@ams-inc.com ● www.ams-inc.com

1

## Table of Contents

|        |                                                                                                                      |     |
|--------|----------------------------------------------------------------------------------------------------------------------|-----|
| **I.** | Introduction and Qualifications | 3 |
| **II.** | Background and Assignment | 3 |
| **III.** | Summary of Opinions | 5 |
| **IV.** | Description of the Teflon Survey | 6 |
| **V.** | Description of the Thermos Survey | 7 |
| **VI.** | The populations in the Teflon and Thermos Surveys were not properly defined or screened for qualification | 8 |
| **VII.** | Respondents in the Teflon and Thermos Surveys do not approximate the relevant characteristics of the population | 9 |
| **VIII.** | The Teflon Survey was not conducted in the proper context for which the Plaintiffs claim trademark protection | 11 |
| **IX.** | Respondents in the Teflon Survey were unable to consistently distinguish between a common name and a brand name | 13 |
| **X.** | The presentation of control stimuli in the Teflon Survey likely introduced bias | 15 |
| **XI.** | The Thermos Survey does not address the relevant research question | 16 |
| **XII.** | Summary of Conclusions | 19 |

Appendix A - Curriculum Vitae

Appendix B – Materials Reviewed

## I.      Introduction and Qualifications

1.      I am a Principal at Applied Marketing Science, Inc. ("AMS"), a market research and consulting firm, and I lead the firm's Litigation Support Practice. I have been at AMS since 2011, and I have worked in the field of market research since 1996. Prior to joining AMS, I held research positions at the Forbes Consulting Group (2003-2011), Lockheed Martin (2002-2003), MCI WorldCom (1999-2002), and Marketing Analysts, Inc. (1996-1999).

2.      In my market research career, I have personally designed and conducted hundreds of market research surveys, across a broad range of modalities and a broad range of populations.

3.      I am a member of the American Association for Public Opinion Research (AAPOR), the Institute for Operations Research and Management Science (INFORMS), and the International Trademark Association (INTA). In addition, I am co-host of a CLE accredited webinar that focuses on the topic of survey evidence used in intellectual property litigation.

4.      I hold a Bachelor of Arts in History from Roanoke College and a Master of Business Administration from the University of Colorado, Colorado Springs. My professional qualifications are described in my curriculum vitae, which is included as Appendix A.

## II.     Background and Assignment

5.      Plaintiff Lifeguard Corp. ("Lifeguard") holds federal trademark registrations for LIFE GUARD (Reg. No. 562,509) and LIFEGUARD (Reg. No. 2,754,820 and 3,800,325) and

3

uses the trademarks in commerce on apparel including bathing suits, underwear, pants, sweatshirts, t-shirts and hats.[1]

6.   It is my understanding that defendant Ann Arbor T-Shirt Company, LLC. ("Ann Arbor") has been using allegedly counterfeit and infringing reproductions of the Lifeguard marks on the same merchandise that Plaintiffs use and are competing with Plaintiffs in the same channels of trade.[2] Plaintiffs allege that the Defendants' unauthorized use of the mark is likely to cause consumer confusion, by deceiving the purchasing public into believing that the allegedly infringing merchandise is manufactured, sold, authorized by and/or affiliated with the Lifeguard mark and/or with Lifeguard Corp.[3]

7.   The Defendants have produced two surveys and an expert report by Mr. James T. Berger (hereafter "Teflon Survey", "Thermos Survey", and "Berger Report") purporting to determine whether "members of the relevant marketplace view the term 'Lifeguard' to be a generic mark."[4] Mr. Berger concludes that, "There is no question in my mind that the word 'lifeguard' is generic and hardly a counterfeit representation."[5]

8.   I have been asked by counsel for Lifeguard to review the methodology employed by Mr. Berger in his Teflon and Thermos Surveys to determine whether the data can be relied upon to support the opinions expressed in the Berger Report. In this report, I provide an opinion on the reliability and validity of the survey methodologies and the conclusions reached in the Berger Report.

---

[1] Complaint, p. 4.
[2] Id., p. 1.
[3] Id, p. 5.
[4] Report of James T. Berger, p. 2.
[5] Id, pp. 14-15.

9.     In undertaking this assignment, I relied on generally accepted principles of market research, as well as my extensive expertise in survey development and the interpretation of qualitative and quantitative data. The work I performed for this investigation was as an employee of Applied Marketing Science, Inc. ("AMS") and other AMS employees worked on this assignment under my direction.  My rate of compensation for this assignment is $500 per hour.  My compensation is not contingent upon the outcome of this case.

10.    I reserve the right to update and revise my opinions and conclusions should any additional data or information become available to me.  A complete list of materials I have considered to date in connection with this particular assignment is included in Appendix B.

## III.    Summary of Opinions

11.    Based on my review of the materials provided to me, as well as my background, education, and professional experience, it is my opinion that Mr. Berger's Teflon and Thermos Surveys are both so fundamentally flawed in design and interpretation that no valid or reliable conclusions can be drawn from the data. The surveys fail to adhere to the basic principles of good survey design set forth in the Federal Judicial Center's Reference Guide on Survey Research, a widely accepted treatise on proper methodology for surveys conducted for litigation, authored by Shari Diamond. The flaws of Mr. Berger's surveys can be summarized as follows:

   a.    The populations in the Teflon and Thermos Surveys were not properly defined or screened for qualification.

b.  Respondents in the Teflon and Thermos Surveys do not approximate the relevant characteristics of the population.

c.  The Teflon Survey did not provide an appropriate frame of reference for respondents to evaluate the Lifeguard mark.

d.  Respondents in the Teflon Survey were unable to reliably distinguish between a common name and a brand name.

e.  The presentation of control stimuli in the Teflon Survey likely introduced bias.

f.  The Thermos Survey does not does not adhere to the established survey methodology that Mr. Berger purports to follow. The photo shown to survey respondents is not appropriate and was clearly constructed to elicit the response Mr. Berger was seeking. Additionally, the flawed survey does not address the appropriate issue for genericness.

## IV.    Description of the Teflon Survey

12.  Respondents qualified for participation in the Teflon Survey if they indicated they had been to a public beach or a public swimming pool in the last year, or indicated that they intended to go to a public beach or a public swimming pool in the next 12 months.

13.  Qualified respondents were provided a set of instructions designed to explain the difference between a common name and a brand name. Respondents were then asked whether they understood the name washing machine to be a common name or a brand name (Q11).

14.  Respondents were then shown 10 words (i.e., STP, Juicy Fruit, Margarine, Teflon, Jell-O, Refrigerator, Aspirin, Coke, Gas Station, American Airlines) and asked whether each

represented a common name or a brand name (Q12). This question was presumably used as a "mini-test" to ensure respondents understood the common name versus brand name dichotomy.

15. Respondents were then asked the key survey question, which included a series of 8 words: Speedo, Surfboard, Bikini, La Blanca, Nike, the Lifeguard mark at issue in the present matter, T-Shirt, and Catalina. For each word, respondents were asked to indicate whether they thought the word was a common name or a brand name (Q13).

**V.     Description of the Thermos Survey**

16. Respondents qualified for participation in the Thermos Survey if they indicated they had been to a public beach or a public swimming pool in the last year, or indicated that they intended to go to a public beach or a public swimming pool in the next 12 months.

17. Qualified respondents were shown a picture of, "a man in a swim suit, with a whistle and sitting on a tower"[6] and then asked if they were familiar with the function of the person in the picture (Q16). Those familiar with the function of the person in the picture were asked to identify the function of the person in the picture (Q17).

**Critiques of the Berger Surveys**

In the sections that follow I provide my critiques of Mr. Berger's surveys.

---

[6] Id., p. 11.

## VI.    The populations in the Teflon and Thermos Surveys were not properly defined or screened for qualification

18.    One of the most important steps in designing surveys used for litigation is to select the appropriate universe. J. Thomas McCarthy states that "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."[7] According to Mr. Berger's report, both of his surveys intended to test "whether members of the relevant marketplace view the term 'Lifeguard' to be a generic mark."[8] However, Mr. Berger's Teflon and Thermos Surveys are both fundamentally flawed because the universe was improperly defined. I discuss this flaw in more detail below.

19.    Deborah Jay states that, "For a genericness survey, the proper universe is the relevant consuming public or those persons likely to rely on the challenged mark in making purchase decisions."[9]

20.    It is my understanding that Plaintiffs sell swimwear and underwear, as well as apparel such as shirts, sweatshirts, t-shirts and beachwear[10] and allege that the defendants are using counterfeiting and infringing reproductions of the Lifeguard mark on the same types of merchandise.[11] Mr. Berger states in his report that, "In the current case, the Defendant is a maker of apparel and often makes t-shirts and tank-tops that have 'Lifeguard' or 'Life Guard' printed on them to identify people who are functioning as

---

[7] J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §3:2 (4th ed.)
[8] Report of James T. Berger, p. 2.
[9] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), pp. 131-132.
[10] Complaint, p. 3.
[11] Id., p. 1.

lifeguards."[12] Therefore, at a minimum, the proper universe in this matter should have been buyers of the types of apparel at issue.

21.     However, Mr. Berger incorrectly defined the universe in both of his surveys as "men and women age 16 and over who have either been to a public beach or swimming pool in the last year or intend to go to a public beach or swimming pool in the next 12 months."[13]

22.     Further compounding this definitional error, survey respondents were never asked whether they had purchased the types of apparel at issue. As a result, Mr. Berger cannot be sure that *any* of the respondents in either of his surveys are part of the appropriate universe. Therefore, respondents were asked in the surveys to provide opinions on products for which they may have no awareness or experience.

23.     The failure to define and screen for the proper survey universe casts serious doubts on the validity and reliability of Mr. Berger's results. As Shari Diamond states, "A survey that samples from an irrelevant universe … will have no probative value."[14]


VII.     **Respondents in the Teflon and Thermos Surveys do not approximate the relevant characteristics of the population**

24.     For surveys used in litigation, it is critical that the sample accurately represents the population of interest.[15] A representative sample provides an unbiased indication of characteristics of the larger population. Failure to sample representatively can result in skewed survey results that do not accurately reflect the larger population.

---

[12] Report of James T. Berger, pp. 8-9.
[13] Report of James T. Berger, p. 10.
[14] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), p132.
[15] Diamond, S.S. (2011) Reference Guide on Survey Research in Reference Manual on Scientific Evidence, 3rd ed., Federal Judicial Center and the National Academies Press, p. 380.

25. It is a well-known phenomenon in the field of market research that some demographic groups are more likely to respond to certain types of surveys than others.[16] Therefore, to ensure that samples are representative it is important that the demographics of the survey respondents match known demographics of the population of interest.

26. Setting aside my criticisms that the incorrect population of interest was chosen for the surveys, Mr. Berger states in his report that he interviewed men and women age 16 and over who have either been to a public beach or swimming pool in the last year or intend to go to a public beach or swimming pool in the next 12 months.[17] However, I see no evidence in either of Mr. Berger's surveys or his reports indicating that any measures were taken to ensure a representative sample (e.g., through click balancing, setting quotas, or targeting).

27. For example, Mr. Berger's survey data show that only 6% of respondents who qualified and completed the Teflon Survey (and 7% who completed the Thermos Surveys) were 35 years of age or older.[18][19] Stated another way, Mr. Berger's survey data suggests that between 93% and 94% of people who visit public beaches or swimming pools are younger than 35 years old. It is unclear to me (and Mr. Berger provides no evidence) whether this sample is representative of the actual marketplace he intended to survey.

28. An improper distribution of age groups in the survey has the potential to introduce significant skews in the survey responses. Younger respondents may have very different opinions and beliefs compared to older individuals. If younger respondents make up a

---

[16] Shih, Tse-Hua (2008) "Comparing Response Rates from Web and Mail Surveys: A Meta-Analysis," in Field Methods, Vol. 20, No. 3, August 2008, pp.259-260.
[17] Report of James T. Berger, p. 10.
[18] Exhibit D Teflon Results, p. 4.
[19] Exhibit E Thermos Results, p. 5.

larger portion of the survey sample than they do in the relevant population, the opinions of the younger respondents will be overrepresented in the survey data and, accordingly, the overall results may not generalize to the actual population of interest.

29.   The failure by Mr. Berger to address whether survey demographics match known demographics of the population of interest casts considerable doubt on the overall representativeness, and therefore reliability, of his survey responses.

**VIII.   The Teflon Survey was not conducted in the proper context for which the Plaintiffs claim trademark protection**

30.   The conclusion reached in the Berger Report (that "There is no question in my mind that the word 'lifeguard' is generic and hardly a counterfeit representation.") assumes without foundation that Teflon Survey respondents were able to properly evaluate the Lifeguard mark in the correct context. Deborah Jay states that, "Whether a mark is generic may depend on the context in which it is used (e.g., Jaguar is a common name for a type of animal and a brand name for a car). In such circumstances, Teflon Surveys may require a frame of reference."[20]

31.   The key survey question in Mr. Berger's Teflon Survey asks, "With respect to the following products, for each of the following names, would you please indicate whether you understand the name to be a common name or a brand name."[21] This question is problematic because it provides no context or frame of reference for respondents in which to evaluate the words. Respondents were never screened for whether they had

---

[20] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), p119.
[21] Exhibit C Teflon Survey, p. 5.

purchased apparel relevant to the current matter, nor were they ever informed that the word Lifeguard was being asked in regard to apparel. Additionally, the words used in the key survey question were not all part of the same product category (e.g., Lifeguard and Surfboard), so there were no contextual clues respondents could have used to determine that they should have been considering Lifeguard in terms of apparel.

32.     To illustrate, 53% of respondents "correctly" identified the word "Catalina" as a brand name.  However, "Catalina" is a brand name for a number of different products, including a type of sailboat, a hotel, swimwear, and even salad dressing. Due to Mr. Berger's flawed line of questioning which lacks context or frame of reference, it is impossible to determine the context in which respondents were evaluating the word. Similarly, it is impossible to know whether respondents were evaluating Lifeguard as a word that describes a person who supervises the safety and rescue of swimmers, a word on a piece of apparel, or something else entirely. As Deborah Jay states, "The failure of a Teflon Survey to connect a word to a context may subject it to criticism and/or cause it to be disregarded."[22]

33.     Based on this significant design flaw, Mr. Berger cannot know for certain whether respondents understood the context in which they were evaluating Lifeguard. This uncertainty compromises the overall reliability and validity of Mr. Berger's Teflon Survey and conclusions.

---

[22] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), p119.

**IX.    Respondents in the Teflon Survey were unable to reliably distinguish between a common name and a brand name**

34.    Deborah Jay states that, "A Teflon Survey includes additional qualifying questions at the beginning to ensure that respondents comprehend the common-name/brand-name dichotomy. After common-name and brand-name definitions are supplied, potential respondents first are queried about one or more words. Only those respondents who correctly classify the first words are asked about the remaining ones (i.e., the disputed mark and the control words)."[23] As will be discussed in the sections that follow, Mr. Berger's Teflon Survey is flawed in that he allowed respondents who did not comprehend the common-name/brand-name dichotomy to participate in the survey.

35.    Before asking the key survey question about Lifeguard, Mr. Berger presented respondents with a question (Q12), presumably to test whether respondents understood the difference between a common name and a brand name. Survey participants were shown 10 words representing a broad cross section of product categories (STP, Juicy Fruit, Margarine, Teflon, Jell-O, Refrigerator, Aspirin, Coke, Gas Station, American Airlines) and then asked whether each represented a common name or a brand name. Mr. Berger's data for this question shows that:

   a.   51% of respondents could not correctly identify STP as a brand name

   b.   48% could not correctly identify Aspirin as a common name

   c.   47% could not correctly identify Teflon as a brand name

   d.   24% could not correctly identify Jell-O as a brand name

---

[23] Id., pp. 115-116.

    e.   20% could not correctly identify Coke as a brand name

    f.   19% could not correctly identify Margarine as a common name

    g.   14% could not correctly identify Juicy Fruit as a brand name

    h.   11% could not correctly identify American Airlines as a brand name

    i.   8% could not correctly identify Gas Station as a common name[24]

36.    Further, when reviewing the raw data, I observed that 83% of respondents incorrectly identified at least one of the terms in Q12 as either a brand or a common name. In fact, 15% of the total respondents in Mr. Berger's Teflon Survey incorrectly classified half (five out of ten) of the items in Q12 as either a brand or common name.[25]

37.    The data for Q12 provides evidence that respondents struggled to comprehend the common versus brand name dichotomy for well-known consumer products. However, these same respondents were all allowed to continue to the key survey question in which they were asked to classify Lifeguard. This is extremely problematic because it demonstrates that a sizeable proportion of survey respondents were unable to correctly recognize common names versus brand names, yet were still allowed to provide opinions (and be counted in the final analysis) on whether Lifeguard is perceived to be a common name or a brand name.

38.    Allowing respondents to participate in the survey who did not understand the difference between a common name and brand name casts serious doubts on whether they were able to accurately answer the key question about Lifeguard. In my opinion, on this basis alone, the Teflon Survey is fundamentally flawed and of no use whatsoever.

---

[24] Exhibit D Teflon Results, pp. 12-21.
[25] Lifeguard Teflon FULL RAW DATA FILE

**X.   The presentation of control stimuli in the Teflon Survey likely introduced bias**

39.   Deborah Jay states that, "In a Teflon Survey the words that respondents are asked to classify first may influence their subsequent answers, which is known as 'question order effects' or 'context effects.' For this reason, the order in which words are read in a Teflon Survey is randomized across respondents."[26] However, I see no evidence in Mr. Berger's Teflon survey (and he does not mention it in his report) that the words presented to respondents in the key survey question were randomized at all. This is problematic for a number of reasons.

40.   First, by presenting the terms Surfboard and Bikini before Lifeguard, it likely primed respondents to think about the beach, and not apparel. If so, then respondents may have been incorrectly evaluating Lifeguard in the context of someone who supervises the safety and rescue of swimmers. Additionally, Lifeguard is presented directly after Nike, which is arguably one of the most famous brand names in the world. There is the distinct possibility that, after seeing the Nike name, respondents were led to believe Lifeguard was generic because it is a less well-known brand. Stated another way, respondents may have believed that because Lifeguard is less well known than Nike, it *must* be a common name.

41.   The failure to randomize the words in the key survey question may have consciously or subconsciously biased the way in which respondents evaluated Lifeguard. This flaw calls into question the reliability and validity of Mr. Berger's Teflon Survey results.

---

[26] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), pp. 121-122.

15

**XI.    The Thermos Survey does not address the relevant research question**

42.    Shari Diamond states in the Reference Guide on Survey Research that, "one indication that a survey offers probative evidence is that it was designed to collect information relevant to the legal controversy … Thus, the content and execution of the survey must be scrutinized whether or not the survey was designed to provide relevant data on the issue before the court."[27] Mr. Berger's Thermos Survey is fundamentally flawed in that (1) it fails to adhere to the established survey methodology he purports to follow and (2) the survey cannot provide relevant data on the issue at hand. In the sections below I describe these flaws in more detail.

43.    Mr. Berger claims he uses the accepted Thermos protocol for testing genericness. In his report, he states that, "The Thermos protocol offers a cue to the respondent and then asks how they would respond to the cue. In the original case, the consumer was shown a vacuum bottle and asked what it was."[28] However, he elaborates no further, and fails to provide any citations or other documentation to support these statements.

44.    It is my understanding that the Thermos Survey format involves asking respondents, in an open ended fashion, what they would call the product at issue. And, as part of that exercise, respondents might also be asked a series of questions including "where would you buy the product" and 'how would you ask for it". Deborah Jay states that, "Since *American Thermos*, a survey inquiring how consumers would ask for or describe a product is known as a Thermos Survey."[29] And Jacob Jacoby explains, "In a *Thermos*

---

[27] Diamond, S.S. (2011) Reference Guide on Survey Research in Reference Manual on Scientific Evidence, 3rd ed., Federal Judicial Center and the National Academies Press, p. 373.
[28] Report of James T. Berger, p. 11.
[29] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), pp. 106.

Study, the interviewer asks the respondent (1) if he or she is familiar with a type of product (for example, containers for keeping liquids hot or cold), (2) what type of store the respondent would select to purchase that type of product, and (3) what the respondent would ask for in the store when attempting to purchase the product."[30]

45.    In Mr. Berger's "Thermos" test, however, he simply shows a picture of "a man in a swim suit, with a whistle and sitting on a tower"[31] and then asks respondents if they are familiar with the function of the person in the picture. Those who indicated that it was a lifeguard were asked to provide their reasons for why they believe that in a follow up question. This line of questioning does not in any way approximate the established Thermos Survey format Mr. Berger purports to follow as it does not focus on the product or mark at issue. The mark at issue is only a tiny aspect of the photo shown to respondents ("a man in a swim suit, with a whistle and sitting on a tower"). In fact, as will be demonstrated in the following paragraph, including elements in the photo that have nothing to do with the mark at issue very likely led respondents to think of Lifeguard as an occupation, rather than focusing their attention on the Lifeguard mark and allowing the respondents to reach their own independent conclusion.

46.    As stated above, respondents in Mr. Berger's "Thermos" Survey who indicated that the person in the picture was a lifeguard were asked why in a follow up question. Mr. Berger reports that 94% of respondents identified the person in the photo as a lifeguard. When asked why they believed so, a sampling of the verbatim responses include: "He is standing on a lifeguard chair", "It looks like a lifeguard tower", "Wearing shorts and

---

[30] Jacoby, J. (2013). Trademark Surveys Volume 1, Designing, Implementing, and Evaluating Surveys. US: American Bar Association.
[31] Report of James T. Berger, p. 11.

17

watching from a lifeguard stand", and "He is watching the people to make sure no one drowns". Not a single person in any of the verbatim responses in Mr. Berger's report mentioned that they believed the person was a lifeguard because the word "Lifeguard" was on found on any apparel relevant to the present matter. In fact, the photo below, which was used as stimuli in Mr. Berger's Thermos Survey, clearly demonstrates that respondents were not even exposed to the Lifeguard mark.[32]



47.     Furthermore, the relevant question was never asked. Whether someone believes a person wearing a shirt with term "Lifeguard" on it is a lifeguard does not establish whether or not the mark has become generic. Mr. Berger's flawed survey question does not address the appropriate issue for genericness, which is, whether the relevant consuming public recognizes *the mark* as a brand name or a common name.[33] There are a number of words

---

[32] Lifeguard Thermos Photo
[33] Deborah Jay, *Genericness Surveys in Trademark Disputes: Under the Gavel*, in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann eds., 2012), p. 125.

that can relate both to a person's profession and also a brand name. For example, a coach can refer to a person who directs the players on a sports team, which might be considered a generic term, or Coach can refer to the luxury fashion company that manufactures leather bags, which is considered to be a well-known brand name. Similarly, the term boss can refer to a person in charge of a worker or organization, which might be considered a generic term, or Boss can refer to the company that puts out men's apparel, which is considered a brand name. Yet had these same respondents been presented with a survey on Coach or Boss that was constructed in a similar manner to the instant survey, it is highly likely that a majority of respondents would have identified Coach and Boss as words relating to occupations rather than brand names. Accordingly, it is crucial to focus the survey questions on the product or mark at issue.

48.    Mr. Berger's "Thermos" Survey fails to adhere to the established survey methodology he purports to follow. More importantly, his "Thermos" survey does not and cannot address the relevant issue, and was clearly constructed to elicit the response Mr. Berger was seeking. As a result, the Mr. Berger's claim that the Lifeguard mark is generic based on the results of his Thermos Survey is highly unreliable and invalid.

## XII.    Summary of Conclusions

49.    It is my opinion Mr. Berger's Teflon and Thermos Surveys are both flawed in design and interpretation, and no valid or reliable conclusions can be drawn from the data.

50.    First, the populations in the Teflon and Thermos Surveys were not properly defined or screened for qualification. The appropriate universe for testing genericness is consumers who are likely to rely on the challenged mark in making purchase decisions. Instead, Mr.

Berger defined the appropriate universe as individuals who visit beaches or public pools. As a result, respondents were asked to distinguish between brand and common names of products for which they may have no awareness or experience.

51. Second, it is unlikely that respondents in the Teflon and Thermos Surveys approximate the relevant characteristics of the population of interest, as defined by Mr. Berger. Mr. Berger did not take any measures to ensure a representative sample. The obvious demographic skews observed in the data have the potential to distort the survey results, and therefore call into question the reliability and validity of the data used to support Mr. Berger's conclusions.

52. Third, the Teflon Survey did not provide an appropriate context or frame of reference for respondents to evaluate the Lifeguard mark. As a result, Mr. Berger cannot know for certain whether respondents were evaluating Lifeguard as a word that describes a person who supervises the safety and rescue of swimmers, a word on a piece of apparel, or something else entirely. This uncertainty compromises the overall reliability and validity of Mr. Berger's Teflon Survey and conclusions.

53. Fourth, respondents in the Teflon Survey were unable to reliably distinguish between a common name and a brand name. There is evidence that a sizeable proportion of survey respondents struggled to comprehend the difference between a common name and a brand name, but were allowed to provide opinions (and be counted in the final analysis) on whether Lifeguard is perceived to be a common name or a brand name.

54. Fifth, the presentation of control stimuli in the Teflon Survey likely introduced bias. There is no evidence that the names presented to respondents in the key survey question were randomized, as are typically done in Teflon surveys. Failure to do so has the

potential to introduce order effects, which may have consciously or subconsciously influenced the way respondents evaluated Lifeguard. This calls into question the overall reliability and validity of Mr. Berger's Teflon Survey results.

55.   Finally, the Thermos Survey does not does not adhere to the traditional survey methodology that Mr. Berger purports to follow. Additionally, the flawed survey does not address the appropriate issue for genericness, and was clearly constructed to elicit the response Mr. Berger was seeking. As a result, Mr. Berger's claim that Lifeguard is generic based on the results of his Thermos Survey is unreliable and invalid.


Dated: September 30, 2016

Brian M. Sowers

Brian M. Sowers

**Exhibit A: Curriculum Vitae**

**Curriculum Vitae of Brian M. Sowers**

Applied Marketing Science, Inc.                    Voice: (781) 250-6313
303 Wyman Street, Suite 205                      Fax: (781) 684-0075
Waltham, MA 02451                                E-mail:bsowers@ams-inc.com

### EDUCATION

| | |
|---|---|
| 2012 | University of Colorado<br>Master of Business Administration |
| 1995 | Roanoke College<br>Bachelor of Arts in History |

### EMPLOYMENT

2015 – Present        Survey Research Expert
                     APPLIED MARKETING SCIENCE, INC., Waltham, MA

- Provide expert research consultation, expert witness testimony, and rebuttal critiques for consumer surveys designed for trademark and false advertising litigation.

2014 – Present        Principal and Practice Lead
                     APPLIED MARKETING SCIENCE, INC., Waltham, MA

- Lead the firm's Litigation Support practice to support expert testimony in civil cases through survey research and other marketing science initiatives.
- Manage referrals and support affiliated academic experts in matters where consumer opinions and behaviors are an important determinant of liability and damages.
- Manage case teams in complex cases (e.g., trademark and trade dress infringement, class action matters, false and deceptive advertising, antitrust issues and patent damages).
- Assist attorneys with assessing the benefits of collecting market research data, critique opposing expert reports, and prepare experts for deposition and trial questioning.

2011 – 2014          Senior Manager
                     APPLIED MARKETING SCIENCE, INC., Waltham, MA

- Supported consumer survey expert witnesses and attorneys in market research survey design and provided consultation to help experts prepare for deposition and trial testimony.

### Exhibit A: Curriculum Vitae

- Managed litigation consulting projects involving consumer surveys in trademark, false advertising, class action, and patent infringement matters.
- Coordinated all aspects of research project, including survey design, fieldwork, data analysis, and report development.

2003 – 2011     Senior Project Manager
                FORBES CONSULTING GROUP, Lexington, MA

- Independently led all phases of custom quantitative and qualitative research for an industry leading marketing research supplier dedicated to consumer-driven business analysis.
- Helped clients identify new marketplace opportunities, developed communication and positioning strategies, measured brand equity, and increased customer satisfaction and retention.
- Managed approximately $2.5 million of custom research annually.

2002 – 2003     Senior Analyst
                LOCKHEED MARTIN CORPORATION, Fairfax, VA

- Developed market analyses and competitive strategies for multiple lines of business.
- Granted Top Secret security clearance for the position.

1999 – 2002     Market Research Analyst
                MCI WORLDCOM, Arlington, VA

- Designed, executed, analyzed, and delivered quantitative and qualitative market research to support internal marketing clients. Insights helped carry singularly focused telecom giant into a world of multiple competitors and diverse product lines.
- Required a heightened awareness of technology shifts, a sense of consumer appetite, and readiness to navigate the shifting landscape.
- Honed research skills in variable research methodologies. Received multiple individual and team awards.

1996 – 1999     Project Manager
                MARKETING ANALYSTS, INC., Charleston, SC

- Managed custom quantitative market research for a leading Honomichl 50 research supplier.

**Exhibit A: Curriculum Vitae**

EXPERT WITNESS

North Lock LLC v. C.V. Brewing Company
TTAB Opposition No. 91219821
Trademark Confusion (2015 Report)

Chase Bank USA, N.A. v. Capital One Bank (USA), N.A.
National Advertising Division ("NAD")
False Advertising (2015 Testimony)

Richard Plass et al. v Sanimax USA LLC
Case No. 2015-cv-000165, Wisconsin Circuit Court, Brown County
Class Certification (2016 Report)

Smart Vent Products, Inc. v Crawl Space Door System, Inc.
Case No. 01:13-cv-05691, United States District Court, District of New Jersey
Trademark Confusion (2016 Report)

Blumenthal Distributing, Inc. v Herman Miller, Inc.
Case No. 5:14-cv-01926, United States District Court, Central District of California
Trade Dress Confusion (2016 Report)

Health New England, Inc. v Trinity Health Corporation
Case No. 3:15-cv-30206, United States District Court, District of Massachusetts
Trademark Confusion (2016 Report)

Reebok-CCM Hockey v Bauer Hockey Corp.
Canadian Trademark Opposition No. 1496949
Secondary Meaning (2016 Report)

Avintiv Specialty Materials, Inc. v 3M Company and Target Corporation
Case No. 3:15-cv-212, United States District Court, Western District of North Carolina
Trademark Confusion (2016 Report)

Adidas International Marketing BV v Bauer Hockey Corp.
Canadian Trademark Opposition No. 1564931 and No. 1564934
Secondary Meaning (2016 Report)

PROFESSIONAL AFFILIATIONS

International Trademark Association (INTA)
Council of American Survey Research Organizations (CASRO)
American Association for Public Opinion Research (AAPOR)

**Exhibit B: Materials Reviewed and Considered**

Complaint (10/26/15)

Report of James T. Berger (7/24/16)

Lifeguard Teflon Full Raw Data File

Lifeguard Thermos Photo

Shari Seidman Diamond, "Reference Guide on Survey Research" in *Reference Manual on Scientific Evidence*, Federal Judicial Center and The National Academies Press (3d ed. 2011).

Jacob Jacoby (2013), "Designing, Implementing, and Evaluating Surveys" in *Trademark Surveys Volume 1*, US: American Bar Association.

Deborah Jay (2012), "Genericness Surveys in Trademark Disputes: Under the Gavel" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, US: American Bar Association.

Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2016).

Shih, Tse-Hua (2008) "Comparing Response Rates from Web and Mail Surveys: A Meta-Analysis," in *Field Methods*, *Vol. 20*, *No. 3*, pp.249-271. Web.