UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
LIFEGUARD LICENSING CORP. and          :      15 Civ. 8459 (LGS)(JCF)
POPULARITY PRODUCTS, LLC,               :
                                        :           MEMORANDUM
                Plaintiffs,             :      AND   ORDER
                                        :
    - against -                         :
                                        :
JERRY KOZAK, ANN ARBOR T-SHIRT          :      ┌─────────────────────────┐
COMPANY, LLC, and RICHARD               :      │ USDS SDNY                │
WINOWIECKI,                             :      │ DOCUMENT                 │
                                        :      │ ELECTRONICALLY FILED     │
                Defendants.             :      │ DOC #: _____ │
- - - - - - - - - - - - - - - - - -:           │ DATE FILED: _3_/_7_/17_  │
JAMES C. FRANCIS IV                            └─────────────────────────┘
UNITED STATES MAGISTRATE JUDGE

    This is a copyright infringement action in which the relevant
marks -- the words "LIFEGUARD" and "LIFE GUARD" used on t-shirts,
swim trunks, and men's underwear -- are owned by plaintiff
Lifeguard Licensing Corp. and licensed to Popularity Products, LLC.
A key issue is whether the marks are generic and therefore not
entitled to protection under the Lanham Act, 15 U.S.C. §§ 1051-
1129. The defendants, Jerry Kozak, Ann Arbor T-Shirt Company, LLC,
and Richard Winowiecki (collectively, "Ann Arbor"), retained two
experts to provide reports regarding genericness. The plaintiffs
hired one expert to rebut those reports. Each side seeks to
preclude the others' expert evidence. For the reasons that follow,
the motions are denied.

Background

    The parties plan to rely on their experts in connection with
motions for summary judgment (and presumably at trial). The
defendants' two experts have submitted three reports based on
consumer surveys. James T. Berger's report relies on two consumer

1

surveys -- a "Teflon" survey (that is, a survey "in which
participants are given a series of names and asked whether those
names are brand names or common names, in an effort to discern how
the public perceives each name," Horizon Mills Corp. v. QVC, Inc.,
161 F. Supp. 2d 208, 220 (S.D.N.Y. 2001) (citing E.I. DuPont de
Nemours and Co. v. Yoshida International, Inc., 393 F. Supp. 502
(E.D.N.Y. 1975))), and a "Thermos" survey (that is, a survey that
"asks participants how they would identify a particular product
given that it performs certain functions, in an effort to identify
if the name of the product is generic," id. (citing American
Thermos Products Co. v. Aladdin Industries, Inc., 207 F. Supp. 9
(D. Conn. 1962))). (Declaration of Thomas P. Heed dated Dec. 12,
2016 ("Heed Preclusion Decl."), ¶ 4). Dr. Thomas Maronick authored
two reports. The first (the "Maronick I Report") was completed in
connection with a prior litigation regarding the same marks at
issue here entitled Lifeguard Licensing Corp. v. GoGo Sports, Inc.,
No. 10 Civ. 9075 (S.D.N.Y) ("GoGo"); the second (the "Maronick II
Report") is based on two surveys performed in connection with this
litigation. (Heed Preclusion Decl., ¶¶ 6-7). The plaintiffs offer
two rebuttal reports -- one for each of the defendants' experts --
authored by Brian M. Sowers. (Heed Preclusion Decl., ¶¶ 8-9).

Each side argues that the reports propounded by the other side
are inadmissible pursuant to Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v.
Carmichael, 526 U.S. 137 (1999). Specifically, the defendants
claim that Mr. Sowers is not sufficiently qualified to testify as

an expert (Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Expert Witness Brian Sowers ("Def. Memo.") at 16-21), and that his methods are unreliable (Def. Memo. at 22-23). The plaintiffs contend that the reports of Mr. Berger and Dr. Maronick are unreliable because the surveys underlying them were fundamentally flawed (Plaintiffs' Memorandum of Law ("Pl. Memo.") at 12-25),[1] and because both experts admitted during deposition testimony that the marks are not generic (Pl. Memo. at 26-30).

Discussion

    A.   Legal Standard

    According to Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert opinion testimony must demonstrate admissibility by a preponderance of proof, see Daubert, 509 U.S. at 592 n.10, and the district court serves as a gatekeeper to ensure that an expert is properly qualified and that his opinion testimony is relevant and reliable, see id. at 597; Kumho, 526 U.S. at 147-48; Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

---

[1] The plaintiffs' memorandum is not paginated, so I use the page numbers assigned by the Court's electronic case filing ("ECF") system.

An expert may be qualified based on his "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Expert opinion testimony must be both relevant -- that is, it must tend to make the existence of any fact that is of consequence to the determination of the action more or less probable -- and reliable. Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002). Expert testimony is considered reliable if: (1) the testimony is based on sufficient facts or data; (2) the expert's technique or methodology in reaching the conclusion is reliable; and (3) the expert has applied the methodology reliably to the facts of the case. Fed. R. Evid. 702; Daubert, 509 U.S. at 589; Kumho, 526 U.S. at 149. However, no one factor is determinative, and district courts have broad discretion in deciding the admissibility of expert testimony. See United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011); Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

    B.   Plaintiffs' Motion

        1.   Experts' Admissions

The plaintiffs assert that each of the defendants' experts admitted during his deposition that the "Lifeguard Marks . . . are not generic with respect to apparel or clothing." (Pl. Memo. at 27). This, they contend, requires preclusion of the expert reports because "[i]t is well settled case-law [sic] in the Second Circuit that an Affidavit provided in support of a summary judgment motion (and by extension, trial testimony as well)[] that contradicts prior deposition testimony must be disregarded." (Pl. Memo. at

26); see, e.g., Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").

The rule to which the defendants allude is known as the "sham affidavit" doctrine, see, e.g., RBFC One, LLC v. Zeeks, Inc., 367 F. Supp. 2d 604, 616 (S.D.N.Y 2005), or the "sham issue of fact" doctrine, see, e.g., In re Fosamax Products Liability Litigation, 707 F.3d 189, 193 (2d Cir. 2013).  It holds that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Kennedy v. City of New York, 570 F. App'x 83, 84 (2d Cir. 2014) (quoting Hayes v. N.Y.C. Department of Corrections, 84 F.3d 614, 619 (2d Cir. 1996)).  The doctrine is designed to vindicate "the utility of summary judgment as a procedure for screening out sham issues of fact," Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969), and champions testimony subject to cross-examination (such as deposition testimony) over other statements because of its heightened reliability, see Jimenez v. All American Rathskeller, 503 F.3d 247, 253 (3d Cir. 2007) (citing Perma Research, 410 F.2d at 578).

It is far from clear that the doctrine is applicable in these circumstances.  First, the purported "sham affidavits" here are expert reports that were submitted prior to each authors'

deposition and about which each was cross-examined.[2]   (Heed
Preclusion Decl., ¶¶ 4, 6-7; Deposition of James T. Berger dated
Oct. 6, 2016 ("Berger Dep."), attached as Exh. A to Declaration of
Gerald Grunsfeld dated Jan. 3, 2017 ("Grunsfeld Decl."); Deposition
of Thomas Maronick dated Sept. 27, 2016 ("Maronick Dep."), attached
as Exh. B to Grunsfeld Decl.); see Zikianda v. County of Albany,
No. 12 CV 1194, 2015 WL 5510956, at *57 n.24 (N.D.N.Y. Sept. 15,
2015) ("The experts' depositions occurred after they authored
reports and it is unclear that the doctrine would apply under those
circumstances.").   Second, the expert reports pre-date the filing
of any motion for summary judgment.  (Heed Preclusion Decl., ¶¶ 4,
6-7)   The Second Circuit has repeatedly reasoned that the doctrine
prevents consideration of contradictory statements, not subject to
cross-examination, submitted in response to a motion for summary
judgment.   See, e.g., In re Fosamax, 707 F.3d at 194 ("[The sham
issue of fact] doctrine applies to stop [the non-moving party] from
manufacturing a factual dispute by submitting testimony from an
expert whom she tendered, where the relevant contradictions . . .
are unequivocal and inescapable, unexplained, arose after the
motion for summary judgment was filed, and are central to the claim
at issue." (emphasis added)); Margo v. Weiss, 213 F.3d 55, 60-61

_____

[2] The defendants served Mr. Berger's original report prior to
his deposition.  (Declaration of Thomas P. Heed dated Dec. 20,
2016, ¶ 3).   Mr. Berger amended his report after his deposition.
(Amended Report of James T. Berger dated Oct. 11, 2016 ("Berger
Report"), attached as Exh. B to Heed Preclusion Decl., ¶ 1).   The
plaintiffs concede that the amended report is "essentially
identical in substance to [the] original report." (Pl. Memo. at 14
n.1).

(2d Cir. 2000) ("[T]he plaintiffs cannot defeat a motion for summary judgment by <u>responding</u> with affidavits recanting that earlier testimony." (emphasis added)).[3]

Even assuming the doctrine is an appropriate vehicle to preclude the defendants' expert reports in support of their defense of genericness, it does not apply here because no statement made by either expert clearly contradicts his deposition testimony. "Generic marks, consisting of words that identify the type or species of goods or services to which they apply, are totally lacking in distinctive quality; they are not entitled to any protection against infringement . . . ." <u>TCPIP Holding Co. v. Haar Communications, Inc.</u>, 244 F.3d 88, 93 (2d Cir. 2001). Genericness is determined by discerning "[t]he primary significance of the registered mark to the relevant public[,] rather than purchaser motivation." 15 U.S.C. § 1064(3). The Second Circuit has recognized that "[i]t is well-established that '[a] word may be generic of some things and not of others,'" pointing to the "familiar example" of "'Ivory[,]' [which] would be generic when used to describe a product made from the tusks of elephants but arbitrary as applied to soap." <u>Genessee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.3d 137, 147 (2d Cir. 1997) (second alteration in original) (quoting <u>Soweco, Inc. v. Shell Oil Co.</u>, 617 F.2d 1178,

---

[3] I disagree with the plaintiffs' assertion that this doctrine applies, "by extension, [to] trial testimony." (Pl. Memo. at 26). As noted, the doctrine protects against creating a false issue of fact with testimony not subject to cross-examination. At trial, where a witness may be cross-examined and impeached with prior inconsistent statements, these concerns are ameliorated.

1183 (5th Cir. 1980), and <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 n.6 (2d Cir. 1976)).

The plaintiffs interpret these principles to require the defendants to show that consumers define the word "lifeguard" as an article of apparel. They point to deposition testimony from both Mr. Berger and Dr. Maronick that assertedly supports their contention that the experts "made it clear that the term lifeguard refers to the occupation of lifeguarding" and "not the genus [of] t-shirts/tank top/sweatshirts etc." (Pl. Memo. at 28-30; Maronick Dep. at 8-9, 11). This argument betrays a cramped view of the jurisprudence on genericness.

For example, <u>Anvil Brand, Inc. v. Consolidated Foods Corp.</u>, 464 F. Supp. 474 (S.D.N.Y. 1978), addressed the mark RUGGER or RUGGERS as used on knit sports shirts. <u>Id.</u> at 476. The court found that "the game of rugby ha[d] become popular in the United States and consequently, the public ha[d] become familiar with the distinctive clothing worn by the players." <u>Id.</u> at 480. It held that the terms "Rugger" or "Ruggers" were generic as applied to "the clothing commonly associated with the game of rugby." <u>Id.</u>; <u>see also Polo Fashions, Inc. v. Extra Special Products, Inc.</u>, 451 F. Supp. 555, 559 (S.D.N.Y. 1978) (use of word "Polo" generic as to clothing associated with sport). These cases indicate that a word denoting a sport or trade can be generic when applied to clothing commonly associated with that sport or trade. Therefore, an admission that the term "lifeguard refers to the occupation of lifeguarding" is not an admission that the term "lifeguard" cannot

8

be generic as applied to certain types of apparel.

For an additional reason, the testimony on which the
plaintiffs challenge Mr. Berger's expert report does not
"unequivocal[ly] and inescapable[ly]" contradict the expert
reports. <u>In re Fosamax</u>, 707 F.3d at 194. Mr. Berger agreed with
counsel's statement that "lifeguard can be generic when describing
the occupation of lifeguards but can be a brand name when referring
to apparel." (Berger Dep. at 145). Not only is the statement
couched in terms of possibility -- the term "<u>can</u> be generic" or
"<u>can</u> be a brand name" -- but, in context, the testimony can be
interpreted to indicate that the "label lifeguard on a shirt" could
be a generic use. (Berger Dep. at 144-45). The plaintiffs thus
overstate their case when they assert that "Mr. Berger agreed that
the word Lifeguard is a generic term for the lifeguard occupation
but a brand name for apparel." (Pl. Memo. at 27).

2. <u>Qualifications of Mr. Berger and Dr. Maronick</u>

The plaintiffs do not directly contend that Mr. Berger and Dr.
Maronick are not qualified to be experts; instead their papers are
larded with derogatory comments about the authors' reputations and
qualifications. (Pl. Memo. at 13 (noting that Mr. Berger's survey
in another case was "fundamentally flawed" and precluded), 14-15
(same), 20 (labeling Mr. Berger's "Teflon" survey "absurd" and
"laughable"), 21 (suggesting that Mr. Berger is "incompeten[t]" and
that Dr. Maronick is "ill-informed" and "has no understanding [of]
trademark genericness"), 25 (Dr. Maronick "flip-flop[s]" regarding
the types of surveys he conducted); Plaintiffs' Reply Memorandum of

Law in Support of Their Cross-Motion ("Pl. Reply") at 8 (courts have "precluded Mr. Berger's reports and surveys on numerous occasions"), 9 (stating that "Mr. Berger's thought process makes zero sense")).   I will therefore (briefly) address the qualification issue.

Under Rule 702 of the Federal Rules of Evidence, before allowing a witness to testify as an expert, the court must determine whether the witness is qualified by assessing whether the "proffered expert has the educational background or training in a relevant field.   Then the court 'should further compare the expert's area of expertise with the particular opinion the expert seeks to offer . . . .'" Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., 769 F. Supp. 2d 269, 282-83 (S.D.N.Y. 2011) (quoting TC Systems Inc. v. Town of Colonie, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002)).   The qualification requirement is to be liberally construed, and an

> "expert should not be required to satisfy an overly narrow test of his own qualifications."   "In considering a witness's practical experience and educational background as criteria for qualification, the only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth."

Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp., No. 04 Civ. 7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (internal citations omitted) (quoting Valentin v. New York City, No. 94 CV 3911, 1997 WL 3323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

Mr. Berger has an MBA from the University of Chicago Graduate School of Business, has worked extensively in the field of

marketing, and has significant market research experience. (Berger Report, ¶¶ 3-5). He is co-author of the textbook <u>Trademark Surveys: A Litigator's Guide</u> and has taught, lectured, and published articles in the field. (Berger Report, ¶¶ 2, 5). In addition, he has testified as an expert in numerous lawsuits, including actions concerning trademark genericness. (Berger Report, ¶ 6).

Dr. Maronick has a Doctorate in Business Administration from the University of Kentucky and a Juris Doctor from the University of Baltimore School of Law. (Maronick II Report, attached as Exh. D to Heed Preclusion Decl., at 2). He has served as the "in-house expert on marketing and survey matters" for the Bureau of Consumer Protection at the Federal Trade Commission. (Curriculum Vitae of Thomas Joseph Maronick ("Maronick CV"), attached as Exh. 1 to Maronick II Report, at 2).[4]  He has published articles on marketing, including on survey research; "undertaken over 150 survey research projects . . . in litigation-related matters"; and testified as an expert witness in Lanham Act cases. (Maronick CV at 3-4). He is currently a professor of marketing at Towson University College of Business and Economics. (Maronick CV at 2; Maronick II Report at 2).

Both of the defendants' experts are qualified to offer opinions on the relevant issue.

---

[4] Because Mr. Maronick's CV is not paginated, I use the page numbers assigned by the Court's ECF system.

3.   <u>Methodological Issues with Surveys</u>

The plaintiffs identify alleged methodological flaws in the surveys upon which the defendants' experts' reports are based. They contend that both Mr. Berger's and Dr. Maronick's "Teflon" surveys identify the wrong "relevant public" for polling (Pl. Memo. at 14-16, 23-24); that Mr. Berger's "Teflon" survey primed the respondents to think of lifeguards, "failed to give the survey respondents the necessary contextual background," and included respondents who answered at least one of the screening questions incorrectly (Pl. Memo. at 15-18); and that Dr. Maronick's "Teflon" survey failed to provide necessary context for the respondents (Pl. Memo. at 24).

"The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence."  6 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 32:170 (4th ed. rev. 2017); <u>see also</u> <u>GoGo</u>, 2013 WL 4400520, at *6 & n.4 (denying motion to preclude made on multiple grounds, including that survey misidentified relevant public, primed respondents, contained leading questions, and failed to include control group); <u>Victoria's Secret Stores Brand Management, Inc. v. Sexy Hair Concepts, LLC</u>, No. 07 Civ. 5804, 2009 WL 959775, at *6 n.3 (S.D.N.Y. April 8, 2009) ("In general, assertions of methodological errors in a survey 'bear exclusively on the weight to be given the survey rather than bearing on admissibility determination under Fed. R. Evid. 403.'" (quoting <u>Friesland Brands, B.V. v. Vietnam National Milk Co.</u>, 221

12

F. Supp. 2d 457, 460 (S.D.N.Y. 2002))); <u>id.</u> at *11 n.9 (refusing to preclude surveys alleged to have drawn from improper universe of respondents, primed respondents, and failed to incorporate control group). Indeed, "[a] survey is only inadmissible if its flaws destroy all of its relevance." <u>Id.</u> The plaintiffs' arguments do not convince me that the defendants' expert reports must be precluded.

Take, for example, the plaintiffs' contention that the proper universe for a survey seeking to detect whether a mark is generic is "past and future purchasers of the product in issue." (Pl. Memo. at 15). That position is undermined by commentators and cases -- including cases cited by the plaintiffs as support for their position -- indicating that to determine whether the use of a mark on a mass-marketed product is generic, what matters is the general public's "common use of language." 2 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 12:4 (4th ed. rev. 2017) (quoting <u>In re Automatic Radio Manufacturing Co.</u>, 404 F.2d 1391, 1395 (C.C.P.A. 1969)); <u>see also</u> <u>Harley Davidson, Inc. v. Grottanelli</u>, 164 F.3d 806, 810 (2d Cir. 1999) ("[D]ictionary definitions of a word to denote a category of products are significant evidence of genericness because they usually reflect the public's perception of a word's meaning and its contemporary usage."); <u>Murphy Door Bed Co. v. Interior Sleep Systems, Inc.</u>, 874 F.2d 95, 101 (2d Cir. 1989) (approving evidence of media usage on issue of genericness because "it is a strong indication of the general public's perception" of a term); <u>Blisscraft of Hollywood v.</u>

United Plastics Co., 294 F.2d 694, 699 (2d Cir. 1961) (reversing district court's finding that term was descriptive because there was no evidence that "public generally" understood term to be synonymous with material from which product was made); PODS Enterprises, Inc. v. U-Haul International, Inc., No. 12 CV 1479, 2015 WL 1097374, at *4-6 (M.D. Fla. March 11, 2015) (discussing dictionary definitions, use of term in popular magazines and books, and prior military usage as evidence of genericness); Horizon Mills Corp. v. QVC, Inc., 161 F. Supp. 2d 208, 217-18 (S.D.N.Y. 2001) (test for genericness of "mass consumed product" is "common usage or understanding by the general public" (quoting Something Old, Something New, Inc. v. QVC, Inc., No. 98 Civ. 7450, 1999 WL 1125063, at *5 (S.D.N.Y. Dec. 8, 1999)); Coach/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC, 110 U.S.P.Q.2d 1458, 1463 (T.T.A.B. 2014) (looking to dictionary definition to determine genericness); cf. J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 371-72 (D.N.J. 2002) (criticizing survey of general public where product not mass-marketed but sold only to certain distributors). Indeed, the original "Thermos" and "Teflon" surveys sought to determine the opinion "of the adult American public," and not some subset of consumers who had purchased or planned to purchase the relevant products. American Thermos, 207 F. Supp. at 21-22; see also 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 12:16 (4th ed. rev. 2017) ("The Teflon Survey was conducted . . . over the telephone of respondents of both sexes who represented themselves to be over 18 years of age."); E.

14

Deborah Jay, <u>Genericness Surveys in Trademark Disputes: Evolution</u> <u>of Species</u>, 99 Trademark Rep. 1118, 1151 (2009) (noting that "[t]he universe for the survey endorsed in <u>American Thermos</u> and in <u>E.I. Du</u> <u>Pont de Nemours</u> was broadly defined," which is appropriate where "a product or service is marketed to the general public"). The plaintiffs' objections to the universes used in the defendants' experts' surveys -- men and women over sixteen who had recently gone to or planned to go to a public beach or pool (Berger Report, ¶ 14), or men and women over the age of 18 (Maronick II Report at 4) -- do not counsel in favor of excluding the reports.[5]

The plaintiffs' other challenges fare no better. They complain that respondents to Mr. Berger's "Teflon" survey were not provided the proper "context," asserting that the phrase "<u>[w]ith</u> <u>respect to apparel</u>" should have been appended to the question, "[F]or each of the following names, would you please indicate whether you understand the name to be a common name or a brand name[?]" (Pl. Memo. at 17; Lifeguard Teflon Survey, attached as Exh. C to Grunsfeld Decl., at 6).[6] But the cases they cite do not support the proposition that this asserted error mandates preclusion. First, their supporting cases deal with trademark

---

[5] Nor am I convinced by the argument that because the two experts used different universes "one of them has to be wrong." (Pl. Memo. at 23). Even if the "relevant public" were required to be drawn with surgical precision -- and the plaintiffs have presented no authority that it does -- the discrepancy here would not make either report inadmissible. <u>See, e.g.</u>, <u>GoGo</u>, 2013 WL 4400520, at *6.

[6] Because the survey is not paginated, I use the page numbers assigned by the Court's ECF system.

dilution surveys that sought to establish whether customers were
likely to confuse two products.  See, e.g., THOIP V. Walt Disney
Co., 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010).  Surveys "designed
to elicit information relevant to the issue of a likelihood of
confusion" should closely "mirror the situation in which the
ordinary person would encounter the trademark."   6 J. Thomas
McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163
(4th ed. rev. 2017).   But, as discussed above, the issue of
genericness is not concerned so much with the state of mind of
someone who is likely to purchase a product, but rather with the
wider buying public's perception of whether a term is synonymous
with the product to which it is applied.   Understanding this,
asking if a term is "common" or a "brand name" -- even without
reference to a particular genus of product -- has relevance.  After
all, before a term can function generically, it must be
sufficiently common.  It must also not signal a producer; that is,
it must not be associated -- or, in the case of so-called
"genericide," must no longer be associated -- with any brand.  For
a similar reason, Mr. Berger's "Thermos" survey, in which he
presented a photograph of a lifeguard to survey respondents and
asked whether they were familiar with his function (Pl. Memo. at
19-20), is somewhat probative, as a failure of the public to
recognize the occupation of a lifeguard would likely preclude a
finding that the label "lifeguard" was generic when applied to
clothing a lifeguard wears, cf. Anvil Brand, 464 F. Supp. at 480.
In short, the plaintiffs may argue that the jury should discount

16

the defendants' surveys by pointing out these alleged weaknesses; however, the experts' reports are not so poorly designed or executed as to require preclusion.[7]   See, e.g., GoGo, 2013 WL 4400520, at *6 & n.4 (denying motion to preclude made on basis that survey misidentified relevant public, primed respondents, contained leading questions, and failed to include control group, among others); Victoria's Secret, 2009 WL 959775, at *11 n.9 (refusing to preclude surveys charged with drawing from improper universe of respondents, priming respondents, and failing to incorporate control group).

### 4.  Late Disclosure

Finally, the plaintiffs contend that they were prejudiced because Mr. Berger did not timely disclose the photograph used in his "Thermos" survey.  (Pl. Memo. at 20-21).  Apparently, the defendants originally provided the wrong image, and only disclosed the correct one at Mr. Berger's deposition.  (Pl. Memo. at 20-21).  The plaintiffs assert that they were prejudiced by this late disclosure because they were consequently unable to "formulate appropriate deposition questions."  (Pl. Reply at 1-2).

Rule 37(c)(1) of the Federal Rules of Civil Procedure allows a court to preclude information not timely disclosed unless the

---

[7] Admittedly attempting to circumvent the page limit (Pl. Memo. at 21), the plaintiffs point me to Mr. Sowers' expert reports for additional support (Pl. Memo. at 21, 24-25).  Judges regularly forgive such strategems, considering arguments apparently not convincing enough to include in the briefs.  But if the plaintiffs believed that they could not present their arguments concisely enough to comply with the page limit, they should have requested an extension of that limit.

failure was substantially justified or harmless. Although "this so-called self-executing provision appears to require exclusion" in certain circumstances, "the imposition of sanctions under this rule is discretionary, and preclusion will be ordered only in rare cases." Semi-Tech Litigation LLC v. Bankers Trust Co., 219 F.R.D. 324, 325 (S.D.N.Y. 2004) (footnote omitted). This is not one of those cases.

The timing of the disclosure was far from optimal, but counsel for the plaintiffs received the correct photograph during Mr. Breger's deposition. (Berger Dep. at 141-42). It is not clear why plaintiffs' counsel could not effectively question Mr. Berger after the image was disclosed or, if more time was needed to "formulate appropriate [] questions," why he did not request continuation of the deposition for that purpose. Indeed, even in this motion, plaintiffs' counsel has failed to identify any question that he would have asked or any information he would have attempted to elicit had the photograph been timely disclosed. In this situation, the late disclosure was harmless.

C.  Defendants' Motion

1.  Mr. Sowers' Qualifications

In contrast to the plaintiffs, the defendants launch a frontal attack on plaintiffs' experts' qualifications. As noted, under Rule 702 a person may qualify as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The defendants argue that Mr. Sowers is unqualified to offer the opinions in his rebuttal reports because he is uninformed regarding

the "Primary Significance Test," is unskilled in statistical analysis, and lacks the necessary education and experience. (Def. Memo. at 16-21).

Mr. Sowers has an undergraduate degree in history from Roanoake College and an MBA from the University of Colorado at Colorado Springs. (Curriculum Vitae of Brian M. Sowers ("Sowers CV"), attached as Exh. A to Amended Reply Expert Report of Brian M. Sowers to the Report of James T. Berger dated Sept. 30, 2016 ("Sowers Rebuttal"), attached as Exh. E to Heed Preclusion Decl. at 1; Sowers Rebuttal, ¶ 4).  He is a principal at a marketing and consulting firm, leading the firm's litigation support practice. (Sowers CV at 1).  Prior to joining his current firm in 2011, he held research positions at a number of other firms, such as Forbes Consulting Group and Lockheed Martin Corporation.  (Sowers CV at 1-2; Sowers Rebuttal, ¶ 1).  Mr. Sowers has experience designing and implementing marketing research surveys and has functioned as an expert in trademark and trade dress cases.  (Sowers CV at 3; Sowers Rebuttal, ¶ 2).

The defendants' complaints about Mr. Sowers' education and experience are overblown, undersupported, or both.  For example, they attack his education, noting that his MBA is from a satellite campus of the University of Colorado, and was completed as an on-line degree.  (Def. Memo. at 19).  But they provide no evidence to support their contention that his education and degree are inferior.  They accuse him of lacking "basic statistical understanding" (Def. Memo. at 16-17), but apparently fail to

19

recognize that the opinions he offers do not include statistical analyses of any complexity. See Cedar Petrochemicals, 769 F. Supp. 2d at 283 (courts must evaluate experts' qualifications in light of "the particular opinion the expert seeks to offer" (quoting TC Systems, 213 F. Supp. 2d at 174)). They dwell on the fact that he could not remember whether he had failed a class or been put on academic probation as an undergraduate over twenty years ago (Def. Memo. at 18-19), but do not suggest how that would be relevant to whether he is qualified to testify as an expert in this case. They appear to fault him because some of his training in the design and implementation of marketing surveys consisted of assisting "actual experts in designing genericness surveys" (Def. Memo. at 18), because he was promoted to principal when his predecessor left (Def. Memo. at 17-18), and because his CV "only mentions surveys three times" (Def. Memo. at 17). These objections fail.

The defendants also count words in Mr. Sowers' rebuttal reports, noting that the word "experience" appears only three times in each document. (Def. Memo. at 20). This assertedly contravenes Federal Rule of Evidence 702 because, where an expert witness relies "solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. But this requirement is designed to guard against a situation where an expert "offer[s] credentials rather than analysis," LinkCo, Inc. v. Fujitsu Ltd.,

No. 00 Civ. 7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (quoting Primavera Familienstifung v. Askin, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)), such as when the witness presents "only [his] qualifications, [his] conclusions[,] and [his] assurances of reliability," Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995), cited in Fed. R. Evid. 702 advisory committee's note to 2000 amendments; see also General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). Here, Mr. Sowers' reports adequately explain his analyses and conclusions, which is what the Federal Rules of Evidence contemplate.

> 2. Mr. Sowers' Report

The defendants also contend that Mr. Sowers' "methodology, to the extent he had one at all, is unreliable." (Def. Memo. at 22). They highlight that Mr. Sowers was unfamiliar with the primary significance test (codified at 15 U.S.C. § 1064(3)) and "misidentified the products sold by the [d]efendants." (Def. Memo. at 22). But they have not established that these alleged defects relate to his "methodology" or make his reports unreliable.

There is no analysis of how Mr. Sowers' understanding (or lack of understanding) of 15 U.S.C. § 1064(3) affects his rebuttal reports; the defendants merely insist that if he cannot understand this subsection, "he cannot be considered reliable in attempting to offer expert testimony about genericness surveys." (Def. Memo. at

22).  That criticism does not warrant preclusion.

The defendants then contend that Mr. Sowers' misidentification of the "scope of apparel" sold by Ann Arbor infects his rebuttal report because it led to a misidentification of "the relevant universe for a genericness test," which Mr. Sowers asserts should include only "the junior user's potential customers." (Def. Memo. at 22).  That is, the defendants charge that the mistake led to (hypothetical) overinclusiveness, because the universe of respondents to Mr. Sowers' (hypothetical) survey would include potential consumers of apparel not at issue in this action. (Deposition of Brian Sowers dated Oct. 20, 2016, attached as Exh. A to Heed Preclusion Decl., at 77-78).  But Mr. Sowers was not designing or administering his own study, merely commenting on the perceived weaknesses of the defendants' experts' surveys. Moreover, he concluded that the defendants' surveys were <u>too</u> <u>broad</u> because they were directed at the general public, not that they were too narrow because they excluded consumers of an (incorrectly) expanded set of apparel.  Therefore, any misunderstanding is irrelevant.

<u>Conclusion</u>

For the foregoing reasons, both the defendants' motion to preclude (Docket no. 134) and the plaintiffs' motion to preclude (Docket no. 152) are denied.

SO ORDERED.

*James C. Francis IV*

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 7, 2017

Copies transmitted this date:

Gerald Grunsfeld, Esq.
Lazar Grunsfeld Elnadav
1795 Coney Island Ave.
Brooklyn, NY 11230

Norris D. Wolff, Esq.
Joshua K. Bromberg, Esq.
Kleinberg, Kaplan, Wolff & Cohen, PC
551 Fifth Ave.
New York, NY 10176

Thomas P. Heed, Esq.
Heed Law Group PLLC
39555 Orchard Hill Pl., Suite 600
Novi, MI 48395